May it please the court and counsel, I'm Larry Gent from Bozeman. I represent Carl Lundstrom, the petitioner in this case. And I begin by directing the court to the Speedy Trial Act itself. And the Speedy Trial Act, which is quoted in our first brief, in our reply brief, talks about one of the reasons for reasonable delay, an excuse, if you will, for avoiding the 70-day time clock, is to obtain counsel. And the infinitive to obtain directly indicates that a person must have time to seek out counsel when they need counsel, either when they first get arrested or if something goes wrong with the counsel they have. And I would lead the court in to this case with that statement because the government's main argument and the district court's focus on not allowing Mr. Lundstrom more time, time that was requested in both Mr. Donovan's first and second motion to withdraw as the lawyer, was that the judge had had a pretrial conference on April 16th and they had a trial date and that's what they were going to do and he wasn't going to consider anything else. And that's the summary of the record. Well, no, no. Didn't he deny that motion without prejudice. He wanted to have the new counsel, if there was going to be one, appear before the court and ask for a continuance. And the implication is that he would have received a continuance. But, you know, this is a problem that goes on quite frequently in the trial courts where they come in the last minute or the last week before and, oh, we have to have a continuance. I don't like my lawyer. And the judge isn't just going to dismiss the or excuse the lawyer that's there now, the defense attorney, because that puts a burden on him. He's going to then have to extend the trial date. Most of the time these folks aren't going to find an attorney. And then he may have someone like Donovan be advisory counsel and it doesn't take long and he didn't. Isn't that right? Isn't that what he did? He said, I'm going to deny this without prejudice. He did deny the motion without prejudice. Yeah. But he also refused under any circumstances to continue the trial date. And I agree with what you say, Judge, but about the last minute counsel, but this is not a case of... Where did he say that I absolutely refuse to continue the trial date? If you look at, in the excerpt of record, and I'd like to direct you there now, it's excerpt of record C. Is that the hearing on the motion that withdraws counsel? Yes. And if you'll look, Judge, at page 6 of excerpt of record C, and the judge says at line 5, this case, however, is set for trial June 12th. The speedy trial clock on the case is running. There was a motions deadline in the case that was established by the order of the court. That motions deadline was June 9th. There were no motions filed. This case is on track to go to trial. And then, Judge, if you'll look at the excerpt of record... That motions deadline was June 9th. Well, this is beyond that. He's just pointing out what the itinerary was. And there have been no motions filed. This case, you know, presently is on track to go to trial. But that doesn't mean if you come in with a lawyer who's then on the record that he would not continue the trial. Judge, the case that is before you is not the case where a new lawyer comes in at the last minute. The case is one where the defendant is diligently trying to retain new counsel. And if you'll look at the other excerpt of record, the other hearing, remember what happens is that Mr. Donovan, a very experienced lawyer, comes in again before the trial court and says, Judge, I can't represent this man. I can't communicate with him. I want out of the case. And the judge holds a hearing. And he also says that... What did the defendant say then? The defendant at the second hearing said nothing. Well, didn't he say somewhere that no, no, no, this is, this hard relationship is not irreparably damaged? Yes, at the first hearing, the district court judge hadn't inquired of the defendant at the first hearing like he's supposed to. He didn't inquire at all at the second hearing. And at the second hearing, Mr. Lundstrom comes. And in addition to the lawyer withdrawing and saying, I can't represent this man because I can't communicate with him effectively, he hooks up in a telephone conference with Joe Freeburg. And we know from the record that Mr. Lundstrom flies to Freeburg. He relates to the district judge that Mr. Lundstrom says, I can't, I just can't communicate with Mr. Donovan. I just can't get it done this way. I need to hire a new counsel. And so they, Freeburg gets on the conference call with the judge when they have the hearing and says, I can't get into this case unless I get a continuance of the trial date and work out the arrangements and get local counsel Prohoc Weche. I don't know any good lawyer. What date was that? Sir, if you look in your excerpt, it's excerpt of record number E. What date? May 30th, 2007. But now the judge wanted somebody to come in. He did, Judge. Why didn't Freeburg get a local lawyer to come in and say, I'm now representing and I ask for a continuance and Freeburg will be involved and so forth. They just talked on the telephone. The judge wanted something concrete. He did, Judge. And here's what happens, though. If you look at that transcript at excerpt G of what happens there is the judge says he does everything but give an advisory opinion and he flat says that he's not going to continue the trial date. Well, I read it that he just didn't want people half in the case, half out. He wanted a definite commitment. Freeburg wanted cash on the barrel, yes. And, Judge, any lawyer that's any kind of a lawyer that's going to survive very long is going to want an advance payment to get into a case like this, is going to want to know that he can do a good job and have the time and he's required by the rules to have that second hearing. I'm not going to give you enough time to do those things. And under the Sixth Amendment, there's not only a right to be represented by counsel of one's choosing. At the time, as I understood it, was to give the defendant somehow he's going to come up with all his money to pay this other chap. And then, you know. And the judge, the trial judge, doesn't say to Blundstrom at all whether he's capable of paying counsel. He does at the first hearing and he says he does. He says he's talked to several lawyers and he's capable of retaining other private counsel. And you'll recall from. Well, Freeburg asked him for the money and he didn't have it. That's, I don't read the record that way. Freeburg asked him to come up with the money and they were in the process of making arrangements or otherwise Mr. Freeburg wouldn't have been willing to get on the conference call with the judge. And on this set of facts, what you have is that you have a defendant who there's been no continuances in the case. None granted whatsoever. Two continuances have been requested. Under the Sixth Amendment, the right to not to have a particular lawyer is just as important as the lawyer of your own choice. I mean, we even have a right to rarely used conditions. But here we have a case where the first lawyer is doing the right thing, saying, Judge, I've got to get out of the case. The defendant is attempting to obtain counsel. We have an edict of Congress that says you have time to obtain counsel of your own choosing. You can get time and that's a reasonable delay under the Speedy No matter what, and if you look at page 8 of the second excerpt of record, that's excerpt of record 8. Was Donovan with the Federal Defender's Office? He was not with the Federal Defender's Office at that time. No, he was private counsel. He doesn't work for the PDs in Great Falls anymore. He was private counsel for Mr. Lundstrom and almost immediately, if you look at the record from the time he gets in the case, he moves to withdraw when he realizes that this is not going to work with him representing Mr. Lundstrom for communication difficulties that are between attorney and client. And my time has expired. I haven't addressed the sufficiency issues yet. Well, go ahead. We'll give you a minute to address those. I'm sorry? Go ahead. We'll give you a minute to do that. On the sufficiency issues, there's two of them. On the conspiracy, there's no agreement to do anything other than for this fellow Victor King to sell Mr. Lundstrom drugs. There's no, the government's assertion that they're dealing drugs together, it's nowhere in the record. You won't be able to find it. On the other issue... They go together to make purchases. They do. They drive together. What's that agreement? I don't think carpooling amounts to a conspiracy. I think it amounts to, if you look at the record, Mr. King refers to his dealer, Dave, as my drug dealer. He's making the connection for Mr. Lundstrom, but there's no agreement whatsoever other than to buy drugs, and there's no fronting of the drugs from King to Lundstrom, as you'd see. There's no connection whatsoever. Whatever Lundstrom's doing with what he's buying is what he's doing. King's success is not dependent in any way on anything Lundstrom does. There's no evidence whatsoever... There's no partnership. There's no partnership. Okay, what else do you have? The other sufficiency issue has to do with the reverse sting. They have a conversation a month before the sale about buying drugs, and it starts out, well, can you do a pound? He says, I might be able to do two, or give me two, or something like that. And then later on, they have a conversation a month later, the day before the reverse sting, the sale, and clearly that conversation, where the deal is sealed, is only for one pound, because $11,000 is what a pound costs. It's all through the record. And King, even on cross-examination, says, well, I thought it was a pound, too. And that's the sufficiency issue on the amount of drugs. Okay. We'll hear from the government. Good morning. My name is Joe Thagard. I'm an assistant U.S. attorney from Helena, Montana. Turning to the issue of the denial of the motion for a continuance, the fact of the matter is, new counsel never entered an appearance in this matter. The one attorney who did express an interest in taking this case on, Mr. Freeburg, was out-of-state counsel. He would have needed to retain local counsel. And he was concerned about being paid, justifiably so. And he hadn't been paid at the time that this conference call occurred with Judge Haddon, or this hearing call occurred with Judge Haddon. I think that the record is clear that Judge Haddon did not categorically state that this matter would not be continued. Looking at excerpt of the record, E, page 8, Judge Haddon says, I cannot and will not continue this trial on the basis of the representation that is made before me at the moment, because Mr. Donovan is still in the case, number one, and you're not in it, Mr. Freeburg, number two, and until you are here and are admitted and I can appropriately recognize you on behalf of the client, we don't have anything to talk about. And then later in that same hearing, the court goes on and says that he isn't going to grant a continuant unless I get appropriate papers before me and appropriate appearances before me that warrants me making a decision that says we're going to do it other than on the schedule we have. And so it was very clear that Judge Haddon was not giving an advisory opinion. Earlier in the, in that same excerpt of the record, he made the statement that I'm not in the habit of giving advisory opinions. The fact of the matter was this wasn't a right And Judge Haddon was put in a difficult position here because essentially what he was, he was on the eve of trial and he had an instance where we had retained counsel involved, both initially and the suggested subsequent counsel was going to be retained, and nothing was being done. He had an attorney appearing in front of him who wasn't qualified to practice in front of the court at that point and, in fact, who hadn't even been retained. And the court certainly didn't abuse its discretion in making the rulings it did, but I think it is He said he had an attorney before him. I'm sorry, Your Honor, I didn't hear you. He said he had an attorney before him who was not qualified. No, I'm speaking about the one who was, Mr. Freeburg, who was suggesting that he might enter the course. And by saying that he's not qualified, I simply mean the fact that he wasn't a member of the bar, the court, and he hadn't been retained. And so under those circumstances, the fact of the matter was the motion simply wasn't right. What about the conspiracy argument? I'll turn to that now, Your Honor. One of the things that happened, and of course the issue is whether or not there were simply sales between King and Lundstrom. There was much more than that. Because what happened was they were both engaged in the sale of Lundstrom. And what King did was he had the source of supply. And Lundstrom was aware that when he would either travel with King or, in the first instance, use his girlfriend to provide money to King, that King was going to go provide that money to this source of supply in Nevada or California, and that the source of supply would then distribute methamphetamine to King. Now that, in and of itself, is a conspiracy. And it's apart from the sale that How is that a conspiracy? Well, because you've got Lundstrom conspiring to have another person, this source of supply, distribute methamphetamine to King, give methamphetamine to King. Now ultimately that's going to go back down the chain to Lundstrom. But the fact of the matter is there is an agreement that Lundstrom is explicitly entering into. I mean, it's the whole purpose of him providing this money and going on these trips for this source of supply to hand that methamphetamine down the chain to King. Later King will provide it to Lundstrom. And then I think also if you go on, there's an email between King and Lundstrom in the August of 2006, prior to the time that King's apprehended by the police. And again, Lundstrom is essentially talking about this whole plan. He's talking about the fact that he needs to sell methamphetamine and that essentially he needs King to get it for him. The other point I would point out with this is that Lundstrom brings in his girlfriend at one point, and so he has a girlfriend. So if someone wants to buy this stuff and they find a seller and they negotiate a price, is that a conspiracy? I think it is. I think when you involve more than two people, and that's where I think there's a distinction here between this case and some of the other case law that's cited by the defendant. Because if it were simply a matter of... If you have a person who's a user and buys it from some seller, that's a conspiracy. No, it isn't, Your Honor. And I think that the case law is pretty clear. However... What's the difference between the example that I just gave you? Because what happens here is you've got Lundstrom, and we'll loosely use the term user here. He's not only negotiating a sale from King to him, he's actually entering into an agreement that King is going to go have methamphetamine distributed to King from another source. So that in and of itself is a conspiracy, because it's apart from the sale to Lundstrom from King. It actually is causing this source to put methamphetamine in King's hands. Every person that's a seller, unless they're a manufacturer, that same rationale will apply. Well, but I think the thing that's a little different here is then you have all these other things that go on, because Lundstrom provides the money. I just gave you a hypothesis. Sure, sure. And I understand that, Your Honor. Go ahead. Lundstrom provides the money to what? Lundstrom provides money to King to go up to this other source of supply, and in some instances just travels with him, knowing that ultimately what that source of supply is going to do is distribute methamphetamine to King. That's a conspiracy. That's an agreement. What was the other point on sufficiency? The other issue had to do with the attempted possession, the sting operation, and what the negotiated price was, or what the negotiated amount was. And I think it's clear when the recordings between Lundstrom and King in excerpts of the record, G, that in fact Lundstrom's talking about getting two pounds. It's pretty clear. There was a timing question, if I understood opposing counsel, was that, yeah, they talked about two, plan on me for two, I think is one point. But that later, the latest conversation was I can buy one. Yeah, and I guess I just don't read the excerpts of the record. It seems consistent throughout that it's two. There is this, ultimately, when the drugs are delivered, it seems to be that Lundstrom's expectation had been that it was going to be two pounds, or one pound, excuse me, or at least that's what he's saying at that point. But all the conversations that predate that, that were recorded, say it's going to be two pounds. Well, it seems like almost anything can be a conspiracy these days. Pardon? It seems as if almost anything can be a conspiracy these days. Well, if it meets the elements, you know, it is a broad charge. It's a helpful charge. But again, I think in this instance that certainly this complies with any strict standards. You know how conspiracy theory was developed? You know who developed it? You know, I'll proceed, I don't, Your Honor. According to Michael Tiger, you know Michael Tiger? Sure, sure. Yeah. He says that he put on a play for the ABA in San Francisco, and this came out. The conspiracy theory was developed by the English to keep down the Irish. So they wouldn't, two of them wouldn't get together, cause trouble. So every time you had two Irishmen, you had trouble. So they had, they developed this conspiracy theory, you know. I'm ready. We brought it here where two working people are picketing, you know. So that's a conspiracy too, see. So we've got to be careful the way we apply conspiracy law. Well, Judge, I agree with that. And I will tell you that I'm not going to tell my mother where conspiracy law originated, because I'm half Irish on her side of the family, and she insists it's my better half. Yeah, well, be honest with your mother. If the panel doesn't have any other questions or suggestions, I'll sit down. Okay. Thank you. Judge, on the sting operation, if you look at excerpt of record G at page 78, which is a wire that occurred on 10-23-06, the day before the sale, if you look at that and it's numbered, the pages are numbered, the first page is 77 and the next page is 78, and you look down there and what you'll see, about five lines down, you see VK, that's Victor King, saying, I need comma, I need 11 out of it. Is that okay? Well, that's the price for one pound, and that's the agreement, that's the meeting of the minds that happens right before the sale. And if you look in the brief, I quote what the defendant said when he was arrested, and he says, I owe Victor King $10,000. And you'll also see in the record that he has $900 and something, $930, in his pickup truck when he's arrested, and that's all quoted in either the facts section or in my brief. That clearly shows that a meeting of the minds occurred for one pound, and one pound is 454 grams, and they charged my client with agreeing, attempting to possess 500 grams or more on the date in question. And the evil that is inherent in this sort of thing, both at trial and at sentencing, is that the government sets the amount, and under a graduated statutory scale of mandatory minimums, the government on a reverse sting can literally set the statutory minimum in an attempt, and that's what's wrong. This is a different situation than in the Tolliver case, where the jury couldn't decide the amount of drugs, and it was an indeterminate amount of drugs. The circuits that have decided this, and you'll see the Tenth Circuit in a New Mexico case, United States v. Dunmire, looked at this issue as if the government chooses to charge somebody with possessing or selling or whatever a certain amount of drugs, they must prove it. And in this case, it's attempting because it's a reverse sting. But you'll see the record. The record is crystal clear that on 1023 and 1024, when he actually got picked up, and what Victor King says on cross-examination, they made a deal for a pound. On the conspiracy, Judge, the only thing I can add to that on sufficiency is that Lundstrom is providing money to King to buy drugs for Lundstrom, not for King. We understand your point. And that's not a conspiracy. That's a sale. It's inherited in every sale. That's the agreement, inherited in every sale of drugs. All right. Time's up. Thank you, Judge. Okay. Next. We've got a lot of cases today. United States v. Boulay.
judges: Pregerson, Canby, Noonan